DECISION AND JOURNAL ENTRY
Defendant Antowan Logan has appealed from his convictions in the Summit County Common Pleas Court on one count of engaging in a pattern of corrupt activity, and one count of money laundering. This Court affirms.
 I.
On October 29, 1998, Defendant was indicted on one count of engaging in a pattern of corrupt activity, a felony of the first degree; one count of money laundering, a felony of the third degree; and, one count of having a weapon under a disability, a felony of the fifth degree.[1] Defendant pled not guilty, and his case was set for a jury trial. On July 6, 1999, Defendant was found guilty on all three counts. The trial court sentenced him to a term of six years for engaging in a pattern of corrupt activity, a term of three years for money laundering, and a term of one year for having a weapon under a disability, each to be served consecutively. Defendant timely appealed, asserting four assignments of error.
 II. A. Assignment of Error Number One The conviction of [Defendant] for the charges of engaging in a pattern of corrupt activity and money laundering in this case is against the manifest weight of the evidence and should be reversed.
 Assignment of Error Number Two There was not sufficient evidence presented by the State to convict [Defendant] of the crimes of engaging in a pattern of corrupt activity and money laundering in this case and should be reversed.
For ease of discussion, this Court will address Defendant's first and second assignment of errors together. Defendant has asserted that the evidence presented at trial did not support his conviction and that the verdict was against the manifest weight of the evidence. Specifically, Defendant has argued that the State failed to prove that he engaged in a pattern of corrupt activity and was money laundering. This Court disagrees.
As an initial matter, evaluations of the sufficiency of the evidence put forth by the state and the weight of the evidence adduced at trial are separate and legally distinct determinations.State v. Gully (Mar. 15, 2000), Summit App. No. 19600, unreported, at 3. To determine whether the evidence before a trial court was sufficient to sustain a conviction, an appellate court must view that evidence in a light most favorable to the prosecution:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; see, also, State v. Thompkins (1997),78 Ohio St.3d 380, 386 ("`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law").
While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. Id. at 390 (Cook, J. concurring). In determining whether the state has met its burden of persuasion, a reviewing court does not view the evidence in the light most favorable to the state. Gully, supra, at 3. Instead, a reviewing court must:
 review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 State v. Otten (1986), 33 Ohio App.3d 339, 340. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
R.C.[2] 2923.32(A) states in relevant part:
 (1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity [.]
 (2) No person, through a pattern of corrupt activity * * *, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.
As used in the statute, "`[e]nterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. `Enterprise' includes illicit as well as licit enterprises." R.C. 2923.31(C).
"Pattern of corrupt activity" means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event.
R.C. 2923.31(E). At least one of the incidents of corrupt activity must be a felony. Id. The two or more incidents of corrupt activity need not be supported by convictions, but they must be proven beyond a reasonable doubt. State v.Burkitt (1993), 89 Ohio App.3d 214, 222-223.
Included in subsection (2)(a) and (c) of R.C. 2923.31(I) is the following definition of corrupt activity:
 A violation of section 1315.55, 1322.02, 2903.01, 2903.02, 2903.03, 2903.04, 2903.11, 2903.12, 2905.01, 2905.02, 2905.11, 2905.22, 2907.321, 2907.322, 2907.323, 2909.02, 2909.03, 2911.01, 2911.02, 2911.11, 2911.12, 2911.13, 2911.31, 2913.05, 2913.06, 2921.02, 2921.03, 2921.04, 2921.11, 2921.12, 2921.32, 2921.41, 2921.42, 2921.43, 2923.12, or 2923.17; division (F)(1)(a), (b), or (c) of section 1315.53; division (A)(1) or (2) of section 1707.042; division (B), (C)(4), (D), (E), or (F) of section 1707.44; division (A)(1) or (2) of section 2923.20; division (J)(1) of section 4712.02; section 4719.02, 4719.05, or 4719.06; division (C), (D), or (E) of section 4719.07; section 4719.08; or division (A) of section 4719.09 of the Revised Code.
* * *
 Any violation of section 2907.21, 2907.22, 2907.31, 2913.02, 2913.11, 2913.21, 2913.31, 2913.32, 2913.34, 2913.42, 2913.47, 2913.51, 2915.03, 2925.03, 2925.04, 2925.05, or 2925.37 of the Revised Code, any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree and that occurs on or after July 1, 1996, any violation of section 2915.02 of the Revised Code that occurred prior to July 1, 1996, any violation of section 2915.02 of the Revised Code that occurs on or after July 1, 1996, and that, had it occurred prior to that date, would not have been a violation of section 3769.11 of the Revised Code as it existed prior to that date, any violation of section 2915.06 of the Revised Code as it existed prior to July 1, 1996, or any violation of division (B) of section 2915.05 of the Revised Code as it exists on and after July 1, 1996, when the proceeds of the violation, the payments made in the violation, the amount of a claim for payment or for any other benefit that is false or deceptive and that is involved in the violation, or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds five hundred dollars, or any combination of violations described in division (I)(2)(c) of this section when the total proceeds of the combination of violations, payments made in the combination of violations, amount of the claims for payment or for other benefits that is false or deceptive and that is involved in the combination of violations, or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds five hundred dollars[.]
Possession of cocaine is at least a fourth degree felony "[i]f the amount of the drug involved exceeds five grams * * * of cocaine that is not crack cocaine or exceeds one gram * * * of crack cocaine[.]"[3] R.C. 2925.11(C)(4)(b). Greater quantities of cocaine would result in felonies of greater degrees. See R.C. 2925.11(C)(4)(c)-(f).
R.C. 1315.55(A) provides in part that:
 (2) No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property or the intent to avoid a transaction reporting requirement under section 1315.53 of the Revised Code or federal law.
 (3) No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.
 (4) No person shall conduct or structure or attempt to conduct or structure a transaction that involves the proceeds of corrupt activity that is of a value greater than ten thousand dollars if the person knows or has reasonable cause to know that the transaction involves the proceeds of corrupt activity.
The evidence before the jury consisted of the following: during 1990 through 1998, the Akron Police Department investigated Defendant. The investigation exposed Defendant's involvement with several persons in the drug business. Detective Richard Heismeyer, a police officer from New Jersey, testified that Defendant pled guilty to conspiracy to possess and/or distribute cocaine during February 1991. Dazzle Young, an admitted drug dealer who is currently serving a prison term, testified that he would go on drug runs with Defendant during the early 1990's. Mr. Young also acknowledged that he was with Defendant on a drug run when they both were arrested in New Jersey during February 1991.
On June 10, 1998, Akron police officers executed a search warrant at 321 Dean Street, the residence of Defendant's close friend, Shawn Whitlow. Sherlock Holmes, a dog from the K-9 narcotics unit, discovered two kilos of cocaine in Whitlow's backyard. Whitlow immediately informed the officers that he had purchased the cocaine from Defendant during May 1998 for $46,000. Pursuant to a plea agreement, Whitlow testified on behalf of the State that he had purchased one kilo of cocaine from Defendant once or twice a month throughout 1992 and 1993 for $22,000. He also remodeled homes that Defendant owned and would receive cash for the work done to these homes. Defendant's cell phone records indicated that Defendant and Whitlow placed numerous calls to each other. Neither Defendant nor Whitlow denied this at trial. Lastly, Whitlow admitted that he owned commercial property with Defendant on Mercer Street even though the title was in the name of Whitlow and Defendant's mother.
At trial, Detective Stump testified that he became involved in the case during Spring 1998. His first task was to subpoena Defendant's financial records from various banks and the State of Ohio. He discovered that Defendant did not file an individual income tax from 1993 to 1997. Detective Stump learned that Defendant had three bank accounts, two were located at Bank One and one was at Star Bank. In the first account at Bank One, the total deposits from February 1997 to July 1998 were $36,548.[4] Nearly all of these instances were cash deposits. The second account at Bank One belonged to Defendant's business, AL Beauty Supply. The total deposits for this account from December 1997 to February 1999 were $25,873. Again, most of the deposits were in the form of cash. Defendant's account at Star Bank revealed a total deposit of $2,256 from September 1998 to November 1998.
With regard to Defendant's business, the investigation showed that the business was not listed in the phone directory, and it was operating at a loss. Defendant's bookkeeper, Deborah Turner, verified that the business was operating at a loss and that no tax return was filed in 1997 because of such loss. As part of the investigation, Detective Pamela Lewis went inside Defendant's business during October 1998. While in the store, she observed that there was a limited inventory of each item and that fifty percent of the shelves were empty. Detective McFarland conducted surveillance of the beauty store during October 1998. He testified that business was very slow because he only saw one car in the parking lot and one or two people enter during the hours of his surveillance.
On December 16, 1998, five search warrants were executed to obtain records and documents at the following properties owned by Defendant or his mother: 499 Lucy Street, 18 Dalton Street, 421 Alexander Street, 550 Cuyahoga Street, and 1703 Hampton Knolls Drive. Detective Leonard testified that the documents revealed that Defendant purchased each house at a sheriff's sale. During the search of Hampton Knolls Drive, the officers saw men's clothing, Defendant's driver's license and identification card, and several documents with his name on it. The officers also found a loaded 9mm handgun registered in Defendant's name in the bedroom, several bills that were paid in cash, and deeds that were in the names of Whitlow and Estella Logan. The search further revealed that Defendant spent $7,604 on car rentals during 1998 despite the fact that he owned a 1980 Oldsmobile and 1995 Buick Riviera. Finally, all the bills for Lucy and Alexander Street were paid in cash.
At trial, Kenny Millender testified as a rebuttal witness for the State that he saw Defendant with Dondi McCoy, a well-known drug dealer who is now deceased. Mr. Millender added that he saw McCoy give Defendant one kilo of cocaine at Ann's Restaurant in Akron, Ohio. Danny Lara, another felon, testified that he did not know Defendant but would buy drugs from McCoy. Detective Raphael Caprey, stated that he had been investigating McCoy before his death. Caprey's investigation revealed that from October 1998 to April 1999 McCoy made 110 phone calls to Defendant and Defendant made 51 phone calls to McCoy.
Defendant testified at trial that his only job is operating his beauty store and repairing homes to sell for a profit. He also admitted that he met McCoy at Ann's Restaurant, but denied any drug activity. Defendant's pastor and relatives testified as character witnesses. His first cousin, Franklin Fitzgerald, stated that he had helped repair Defendant's properties located on Dalton and Alexander Street. Mr. Fitzgerald testified that Defendant would pay him in cash and gave him the Oldsmobile for transportation. Robert Johnson, Defendant's uncle, stated that he taught Defendant how to remodel and sell homes for a profit. He testified that Defendant worked with him on repairing houses for two years and he paid Defendant approximately $15,000. Mr. Johnson helped Defendant start his business of remodeling homes by lending him $8,300 in 1997, so Defendant could purchase a house at the sheriff's sale. Lastly, Mr. Johnson noted that Defendant still owes him $8300.
Upon reviewing the record, this Court concludes that Defendant's conviction was not against the manifest weight of the evidence. In order to sustain a conviction for engaging in a pattern of corrupt activity, the two (or more) incidents of corrupt activity must have each been proven to be valued at $500. In the case at bar, Whitlow testified that, on more than one occasion; Defendant sold him at least one kilo of cocaine for $22,000. The evidence in this case reveals that Defendant's business continued to operate at a loss, yet he would deposit large sums of cash in his bank accounts and purchase property to remodel. In light of the foregoing, this Court concludes that this is not an exceptional case in which the weight of the evidence warrants a new trial. Moreover, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence for the jury to find that Defendant engaged in a pattern of corrupt activity and was money laundering. Defendant's first and second assignments of error are overruled.
 B. Assignment of Error Number Three
 The trial court committed prejudicial error and violated [Defendant's] Fourteenth Amendment right to due process and [Defendant's] Sixth Amendment right to confrontation when it allowed the State to introduce evidence regarding a deceased person.
In his third assignment of error, Defendant has argued that his constitutional rights were violated when the trial court allowed evidence of Dondi McCoy's drug dealing. Essentially, he has asserted that he was not allowed to confront the witness and the evidence is inadmissible hearsay because McCoy is dead. This Court disagrees.
Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). To constitute hearsay, two elements are required. First, there must be an out of court statement. Second, that statement must be offered to prove the truth of the matter asserted. State v. Maurer (1984),15 Ohio St.3d 239, 262. If either element is missing, the testimony is not hearsay. Id.
A review of the record reveals that the State did not introduce any statements from McCoy. Instead, the evidence concerned the witnesses' personal knowledge of McCoy being a drug dealer. Such evidence is not hearsay because the State did not introduce any statements from McCoy. This Court further notes that Defendant's attorney did cross-examine the witnesses regarding their knowledge of McCoy's drug activities and his relationship to Defendant. In light of the foregoing, Defendant's third assignment of error is overruled.
 C. Assignment of Error Number Four It is prejudicial error and a violation of [Defendant's] right under the United States Constitution and state of Ohio Constitution for the State to vouch for the credibility of the witness.
In his fourth assignment of error, Defendant has argued that the State's comment during its closing argument that Shawn Whitlow is a credible witness resulted in prejudicial error. This Court disagrees.
It is important to note that Defendant failed to object at trial to the State's comment. Because he did not object at trial, he has waived his right to challenge this error on appeal except to the extent that it constituted plain error. State v. Joseph
(1995), 73 Ohio St.3d 450, 455. Crim.R. 52 sets forth the definitions of harmless error and plain error:
 (A) Harmless error. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.
 (B) Plain error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus. Plain error does not exist unless, but for the error, the outcome at trial would clearly have been different. State v. Moreland
(1990), 50 Ohio St.3d 58, 62.
After reviewing the record, this Court cannot say that, but for the comment from the State that Shawn Whitlow is a credible witness, the outcome of the trial would have been different. Accordingly, the alleged error does not rise to the level of plain error. Defendant's fourth assignment of error is overruled.
 III.
Defendant's assignments of error are overruled. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ BETH WHITMORE
FOR THE COURT, SLABY, J., CARR, J., CONCURS.
[1] Defendant did not challenge his conviction for having a weapon under a disability, therefore this Court will not address it.
[2] For ease of discussion, this Court has only referred to the current sections in Title 29, effective July 1, 1996. Although some of the acts in this case occurred prior to the enactment of S.B. 2, the outcome of this case is not effected by the subsequent changes in Title 29.
[3] One thousand grams equals one kilo.
[4] Defendant and his mother, Estella Logan, shared this account. The record indicates that Defendant's mother had a previous personal account from April 1995 to October 1995 at Bank One. During this time, Defendant's mother only deposited $2.00. A request for tax returns further indicated that the income of Defendant's mother was approximately $13,000.